**IN THE UNITED STATES DISTRICT COURT FOR**
**THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

DEBORAH A. SKEENS and
LINDEN SKEENS,

     Plaintiffs,

v.             CIVIL ACTION NO. 3:05-0855

REBOUND, INC., doing business
as HealthSouth Rehabilitation
Hospital of Huntington and
HEALTHSOUTH CORPORATION,

     Defendants.

**MEMORANDUM OPINION AND ORDER**

   Pending before the Court is a Motion for Summary Judgment by Defendants

Rebound, Inc., d/b/a HealthSouth Rehabilitation Hospital of Huntington and HealthSouth

Corporation.  For the following reasons, the Court **GRANTS** the motion.

**I.**
**FACTS**

   In their Complaint, Plaintiffs Deborah A. Skeens and her husband Linden Skeens

allege that Ms. Skeens was a patient at Defendant HealthSouth Rehabilitation Hospital

(HealthSouth) from August 7, 2002, until August 18, 2002, receiving treatment for complaints and

complications resulting from her multiple sclerosis.  Ms. Skeens asserts that at some point while she

was a patient at HealthSouth she was sexually assaulted by an unknown male.  At her deposition

taken on November 17, 2006, Ms. Skeens claims that she did not remember the assault until October

of 2003, when she was a patient at St. Mary's Hospital (St. Mary's) and she heard "squeaky shoes"

and "started remembering stuff." *Deposition of Deborah Ann Skeens*, at 80 (Nov. 17, 2006).  She

said she immediately told her doctor about her memory, and her doctor recommended that she report it. *Id.* at 82.  She said she told her husband the following day when he came to visit.  *Id*. at 84-85.

Ms. Skeens stated the memories of the assault have been coming to her in her dreams at night. *Id*. at 81.  In describing the attack and her attacker, Ms. Skeens stated she only remembered "bits and pieces of" the attack. *Id.*, at 67-68.  She said she did not remember the date of the attack, the color or length of her assailant's hair, whether he had facial hair, whether he was short or tall, his nationality, what type of voice he had, what color eyes he had, whether he wore any jewelry or glasses, or his build. *Id*. at 66-70.  She said she did remember he was a white man, dressed all in white, who she thought had short sleeves, and squeaky shoes. *Id.* at 68-71.  She also was able to describe some aspects of the sexual assault, and she said she remembered biting the man when he put his hand on her mouth. *Id*. at 71-75.  Ms. Skeens further stated that she did not recall if she had any marks or cuts after the assault and did not remember if her clothes were ripped. *Id.* at 75.  At some unknown point after the alleged assault, Ms. Skeens states she remembers that more than one male helped her shower which she typically did herself, but she could not describe any of these men. *Id.* at 76-78.  Ms. Skeens stated that, except for her memory, she was unaware of any evidence of the assault. *Id*. at 95-96.

At his deposition, Mr. Skeens stated he and his wife told a representative of HealthSouth before Ms. Skeens was admitted that they did not want any males dressing or bathing her. *Deposition of Linden Skeens*, at 19 (Nov. 17, 2006).  He said they voiced their concerns again on the day she was admitted. *Id*. at 19-20.  After being admitted, Mr. Skeens said his wife called him

at work from HealthSouth and told him about her being showered by the male nurses during the night. *Id*. at 20-21.  He also stated her clothes were missing that evening, but the following day they were all hung up in her locker. *Id*. at 21.  He said they complained to administration about the showering incident. *Id*. at 22-23.  In addition, Mr. Skeens explained that his wife was transferred from HealthSouth to St. Mary's because she began having seizures. *Id*. at 31.  On that same day, but prior to her having the seizures, Mr. Skeens stated his wife was suffering from hallucinations about Jesus and the Devil. *Id*. at 29-30.  She also told him about a man that came into her room, he had a hairy arm, and he put his hands on her legs. *Id*. at 30-31.  Mr. Skeens stated that his wife told him he saved her when he came into the room. *Id*. at 31.  He further related that his wife did not know who she was or where she was for a number of days after she was transferred on August 18, 2002, to St. Mary's. *Id*. at 33.  He also said she kept talking about there being a baby in her stomach. *Id*. at 33-34.  Ms. Skeens remained at St. Mary's until approximately August 30, 2002. *Id*. at 29.

Once at St. Mary's, Mr. Skeens began to suspect that his wife may have been assaulted at HealthSouth. *Id*. at 45.  He said his concerns were based upon the fact his wife told him she was showered by men, her clothes were missing for a day, she related that someone put his hand on her legs, and the doctors could not find a medical reason for her mental state. *Id*. at 47-48.  He claimed he called HealthSouth and discussed his concerns with Dr. Kumar, a psychiatrist, and he also called the State Police. *Id*. at 45-46.  Mr. Skeens said that the police officer he spoke with told him not to discuss the matter with his wife and wait for her to mention it.  If she mentioned it, Mr. Skeens was told to call the police officer back and she would come to the hospital and speak with her. *Id*.  at 46.  He said his daughter independently had the same suspicion he did so they also

-3-

discussed the matter with Dr. Ahmad, a neurologist, at St. Mary's. *Id*. at 48.  According to Mr. Skeens, Dr. Ahmad did not seem to believe them. *Id*.  Mr. Skeens said after about seven days at St. Mary's, Ms. Skeens began to act like herself and she knew who people were and where she was. *Id*. at 51-52.

Mr. Skeens said he never discussed his suspicions with his wife until October of 2003, when she started acting like she did the week after she was at HealthSouth. *Id*. at 51-52. Ms. Skeens was readmitted to St. Mary's and she told her husband she heard "squeaky shoes" in the hallway and she recalled she was raped at HealthSouth. *Id*. at 52.  Mr. Skeens informed Dr. Dawn MacFarland of Ms. Skeens' comments. *Id*. at 53.  After speaking with Ms. Skeens, Dr. MacFarland told Mr. Skeens that something could have happened and she wanted to know what he wanted to do. Mr. Skeens sought professional help for his wife, but he did not contact the police. *Id*. at 53-56.

In November of 2003, Ms. Skeens began treatment with Julie Branhan, M.S.W., L.I.C.S.W.  In October of 2005, she also began receiving treatment with Dr. Nancy Graham, a psychiatrist.  Both Ms. Branhan and Dr. Graham have diagnosed Ms. Skeens with post-traumatic stress disorder (PTSD). *Deposition of Julie Branhan*, at 45-46 (Feb. 22, 2007); *Deposition of Nancy B. Graham*, at 38 & 42 (March 2, 2007).  Using the Diagnostic Statistical Manual, Ms. Branhan described PTSD in the following way:

> The person experienced, witnessed or was confronted
> with an event that involved actual or threatened death
> or serious injury or threat to the physical integrity of
> self or others.

And then the second criteria is that the person's response to that event involved intense fear, helplessness or horror. So those two things have to be in place.

And then the rest of the criteria has to do with, umh, reexperiencing the traumatic event in certain ways, such as nightmares or vivid recollections, flashbacks. Umh, or just disturbing memories.

So – and then the last part of the criteria has to do with the person's emotional reaction. Efforts to avoid thoughts, feelings or conversations associated with the trauma. Efforts to avoid activities that arouse recollections. Inability to recall an aspect of the trauma.

Umh, difficultly falling asleep, irritability, difficulty concentrating, hypervigilance.

*Deposition of Ms. Branhan*, at 146-47. Ms. Branhan stated that she could not verify whether or not Ms. Skeens was raped, but she said she exhibited symptoms consistent with a trauma. *Id.* at 148. Although Ms. Branhan knew that Ms. Skeens had a history of psychosis and delusional thinking she never reviewed Ms. Skeens' medical records from HealthSouth. *Id.* at 59 & 67. She said she was aware that when Ms. Skeens transferred from HealthSouth to St. Mary's "she had some kind of acute mental status change," but because she was not treating Ms. Skeens at the time she could not put a specific clinical label on her. *Id.* at 80. Ms. Branhan further said the only psychosis she specifically was aware of was related to her by a doctor from Ohio who told her that in March of 2003 Ms. Skeens "believed God had healed her husband's vasectomy to make her pregnant." *Id.* at 166. Nevertheless, Ms. Branhan stated she did not think the rape was attributable to a delusion because Ms. Skeens presented with no delusional symptoms when she met with her and her clinical presentation was consistent with trauma, not psychosis. *Id.* at 67 & 152-154.

-5-

During her deposition, Dr. Graham stated Ms. Skeens told her of the assault at HealthSouth, but Dr. Graham said it is possible the alleged assault was a delusion. *Deposition of Dr. Graham,* at 67-69.  Dr. Graham stated she could not identify the trauma that caused Ms. Skeens' PTSD. *Id*. at 67.  Dr. Graham further explained that "sometimes if people are very traumatized they don't remember what has happened to them at the time.  They become amnestic for that event." *Id*. at 70.  In responding to a question about her thoughts on "recovered memories," Dr. Graham said it is a "dirty subject in psychiatry" because it is a controversial over whether or not it is legitimate. *Id*. at 72.  She said she did not know what the truth is, but there are occasions in which people forget about an occurrence and later remember it. *Id*. at 73-74.  She believed that you had to consider each situation on a case-by-case basis. *Id*. at 74.

Defendants also submitted a lengthy report by Dr. Terence W. Campbell, a forensic psychologist, who reviewed many of the records in this case, including Ms. Skeens', Mr. Skeens', and Ms. Branhan's depositions.  Based upon his review, Dr. Campbell found Ms. Branhan's assessment inadequate.  For instance, he pointed out that Ms. Branhan had not reviewed Ms. Skeens' past records from HealthSouth or St. Mary's and was unaware of her psychosis at that time.  Indeed, based upon his review, Dr. Campbell opined "Ms. Skeens was floridly psychotic during her stay at HealthSouth in August of 2002." *Report of Dr. Terence W. Campbell*, at 29.  In addition, Dr. Campbell said that the symptoms Ms. Skeens described as being consistent with trauma could all be reactions in response to imaginary traumas. *Id*.  Along this same line, Dr. Campbell concluded that "[f]alse memories can provoke the same stress related reactions that actual memories provoke.

Consequently, Ms. Skee[n]s' reports of stress related reactions related to her allegations cannot serve to substantiate those allegations." *Id*. at 30.

      In their Complaint, Plaintiffs allege eight different Counts against Defendants, which include: Count I - Assault and Battery; Count II - Outrageous Conduct; Count III - Intentional Infliction of Emotional Distress; Count IV - Negligent Entrustment; Count V - Negligence; Count VI - Premises Liability; Count VII - Punitive Damages; and Count VIII - Loss of Consortium. However, Plaintiffs waited until October 25, 2005, to file the Complaint against Defendants.  In their Motion for Summary Judgment, Defendants argue that all Plaintiffs' claims are subject to West Virginia's two-year of statute of limitations[1] and, therefore, are barred because Plaintiffs did not file their claim for more than three years after the alleged assault occurred.  On the other hand, Plaintiffs assert the statute of limitations in this case should be tolled because Ms. Skeens did not remember that she was raped until October of 2003, when she heard "squeaky shoes" in the hallway at St. Mary's.  For the following reasons, the Court agrees with Defendants and finds that Plaintiffs' action is barred by the statute of limitations.

## II.
## STANDARD OF REVIEW

      To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P.* 56(c).  In considering a motion for summary judgment, the Court will not "weigh the

---

[1]*See* W. Va. Code § 55-2-12 (providing, in part, "[e]very personal action for which no limitation is otherwise prescribed shall be brought: . . . (b) within two years next after the right to bring the same shall have accrued if it be for damages for personal injuries . . . .").

evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

**III.**
**DISCUSSION**

The heart of the issue before the Court is whether Plaintiffs' had enough information in 2002 to investigate and bring an action against Defendants. In support of their positions, both sides rely upon *Gaither v. City Hospital, Inc.*, 487 S.E.2d 901 (W. Va. 1997).[2] In *Gaither*, the

---

[2]Plaintiffs have not alleged that Defendants engaged in any fraudulent concealment and, therefore, the parties agree that the statute of limitations cannot be tolled on those grounds. *See Syl. Pt. 3, Cart v. Marcum*, 423 S.E.2d 644 (1992) (permitting tolling where "the defendant prevented the plaintiff from knowing of the wrong at the time of the injury"); *limitation of Cart recognized in Miller v. Monongalia County Bd. of Educ.*, 556 S.E.2d 427, 433 n.3 (W. Va. 2001) (Starcher, J., concurring) (observing that *Gaither* either modified or overruled *Cart* and "subsequent decisions . . . make clear that *Gaither* . . . is the preferred statement of the discovery rule; *Cart* . . . governs (continued...)

-8-

plaintiff was injured in a motorcycle accident and was transported to City Hospital. 487 S.E.2d at

903.  From City Hospital, the plaintiff was taken to the Maryland Institute for Emergency Medical

Services Systems ("Shock Trauma"), where his right leg was ultimately amputated. *Id.* 903-04.

More than two years after the accident, the plaintiff learned for the first time that the Shock Trauma

physicians believed a delay in his transfer from City Hospital to Shock Trauma contributed to his

amputation.  Prior to this time, the plaintiff believed his leg was amputated solely because of the

accident. *Id.* at 904.  The plaintiff brought a malpractice action against City Hospital, and City

Hospital moved for summary judgment based upon the statute of limitations. *Id.* at 905.

City Hospital argued the plaintiff knew of his injury at the time of the accident and

failed to exercise his duty of reasonable diligence to investigate and determine why his leg was

amputated. *Id.*  In addition, City Hospital pointed to the fact that it did nothing to prevent the

plaintiff from knowing of the alleged malpractice at the time of the injury. *Id.* at 908.  Therefore,

City Hospital asserted that the plaintiff should not have the benefit of the discovery rule.

In rejecting City Hospital's argument, the court held in Syllabus Point 4:

> In tort actions, unless there is a clear statutory
> prohibition to its application, under the discovery rule
> the statute of limitations begins to run when the
> plaintiff knows, or by the exercise of reasonable
> diligence, should know (1) that the plaintiff has been
> injured, (2) the identity of the entity who owed the
> plaintiff a duty to act with due care, and who may

----

[2](...continued)
only those cases where the plaintiff is compelled to allege some deed by the defendant concealed
the cause of action from the plaintiff").

> have engaged in conduct that breached that duty, and
> (3) that the conduct of that entity has a causal relation
> to the injury.

Syl. Pt. 4, *Gaither*.  Under this rule, the court said "knowledge sufficient to trigger the limitation period requires something more than a mere apprehension that something may be wrong." *Id*. at 909. However, the court stated it would "not go so far as to require recognition by the plaintiff of *negligent* conduct. . . . [It] simply . . . [held] that once a patient is aware, or should reasonably have become aware, that . . . [negligence] by a particular party has caused a personal injury, the statute begins." *Id*. (italics original).  In other words, the court explained the statute of limitations is tolled "until a plaintiff, acting as a reasonable, diligent person, discovers the essential elements of a possible cause of action, that is, discovers duty, breach, causation and injury." *Id*.

Applying this rule to the facts before it, the court found that the plaintiff in *Gaither* had no knowledge suggesting wrongdoing by a defendant. *Id*.  at 910. Therefore, the court said the discovery rule should apply because, although the plaintiff was aware of his injury and that City Hospital owed him a duty of care, there was nothing to indicate he had any reason to know within two years of his accident "that City Hospital may have breached its duty and failed to exercise proper care, or that City Hospital's conduct may have contributed to the loss of his leg." *Id*.  In addition, the court pointed out the hospital did not set forth any circumstances which would have alerted the plaintiff to investigate a malpractice claim against the hospital within two years of the accident.  Thus, the court determined the plaintiff had no affirmative duty to seek hospital records earlier than he did and it was irrelevant whether he could have requested the records within the two-year period. *Id*.  Likewise, the court said his parents were under no duty to inform their adult son of

conversations they had with the treating physicians about those physicians' suspicions about the cause of amputation. *Id*.  Accordingly, the court reversed the circuit court's decision to grant summary judgment in favor of the hospital and remanded the action for further proceedings. *Id*. at 911.

The issue in the present cases hinges on the first prong of Syllabus Point 4 of *Gaither*, that is, whether Ms. Skeens knew, or by the exercise of reasonable diligence should have known, that she was assaulted within two years of the alleged event.  The evidence is clear that while Ms. Skeens was still a patient at HealthSouth she told her husband that a man who had a hairy arm came into her room and put his hands on her legs and her husband had saved her.  In addition, it is clear that this comment was made in such a way that it led Mr. Skeens and their daughter to believe that Ms. Skeens may have been sexually assaulted.  Indeed, this comment must have been made in such a way that it gave Mr. Skeens "more than a mere apprehension that something may be wrong." *Gaither*, 487 S.E.2d at 909.  Mr. Skeens was so concerned about his wife's comment and demeanor that not only did he discuss his fears with two physicians, but he went so far as to call the State Police. *Deposition of Mr. Skeens*, at 46-48.

Plaintiffs argue that, as in *Gaither* where the Court said that it would not impute the knowledge of the parents onto their adult son, the fact Mr. Skeens may have been aware of the assault is irrelevant as to whether or not his wife knew she was assaulted.  However, the Court finds that *Gaither* is distinguishable in this regard because, in this case, Ms. Skeens actually made the comments that gave rise to her husband's concerns.  Unlike the parents in *Gaither*, this case is not

a situation in which Mr. Skeens learned of wrongdoing from a third party.  Mr. Skeens learned of the event from his wife.  The issue then becomes whether Ms. Skeens acting as a reasonable, diligent person could have discovered the injury.

At the time she told her husband, Ms. Skeens knew that someone had touched her. Certainly, by her husband's and daughter's reactions, the context in which she conveyed this information indicated that the nature of the touching was improper.  Setting aside Ms. Skeens' mental state for the moment, the Court finds this knowledge was sufficient to begin the running of the statute of limitations.

In considering Ms. Skeens' mental state, the Court specifically recognizes that Plaintiffs have *not* argued that the statute of limitations should be tolled for mental incompetency pursuant to West Virginia Code § 55-2-15, which provides, in part:

> If any person to whom the right accrues to bring any
> such personal action . . . shall be, at the time the same
> accrues, . . . insane, the same may be brought within
> the like number of years after his becoming . . . sane
> that is allowed to a person having no such impediment
> to bring the same after the right accrues . . . .

W. Va. Code § 55-2-15, in part.  In note 3 of *Worley v. Beckley Mechanical, Inc.*, No. 33190, 2007 WL 1461174 (W. Va. May 17, 2007), the West Virginia Supreme Court discussed the term "insane" and found that the definition of an "insane person" as found in West Virginia Code § 2-2-10(n) applies to § 55-2-15. Section 2-2-10(n) provides that an "'insane person' include[s] everyone who has mental illness as defined in" § 27-1-2. W. Va. Code § 2-2-10(n).  Section 27-1-2 defines "'[m]ental illness' . . . [as] a manifestation in a person of significantly impaired capacity to maintain

-12-

acceptable levels of functioning in the areas of intellect, emotion and physical well-being." W. Va. Code § 27-1-2. In note 3 of *Worley*, the court further discussed the previous decision in *Cobb v. Nizami*, 851 F.2d 730, 732 (4th Cir. 1988), in which the Fourth Circuit considered the meaning of the term "insane" as found in § 55-2-15 and stated:

> Although there has been no definitive interpretation of § 55-2-15 by the West Virginia Supreme Court of Appeals, the term "insane" as used in similar statutes has been held by other courts to mean "such a condition of mental derangement as actually to bar the sufferer from comprehending rights which he is otherwise bound to know." Stated another way, "'insane' or of 'unsound mind' . . . means a condition of mental derangement which renders the sufferer incapable of caring for his property, of transacting business, of understanding the nature and effect of his acts, and of comprehending his legal rights and liabilities."

851 F.2d at 732 (quoting *Williams v. Westbrook Psych. Hosp.*, 420 F. Supp. 322, 325 (E.D. Va. 1976), and *Goewey v. United States*, 612 F.2d 539, 544 (1979)). In Syllabus Point 3 of *Worley* the court explained, "[t]he general purpose of W. Va. Code § 55-2-15 (1923) is to toll the commencement of the running of the statute of limitations so that the legal rights of infants and the mentally ill may be protected." Syl. Pt. 3, *Worley*.


If Plaintiffs had argued in its Response that the statute of limitations should be tolled because of Ms. Skeens' mental incompetency, considering the facts in a light most favorable to Ms. Skeens, tolling clearly would be appropriate while she was a patient at HealthSouth and after she was transferred to St. Mary's. Even Defendants' expert opines that "Ms. Skeens was floridly psychotic during her stay at HealthSouth in August of 2002." *Report of Dr. Campbell*, at 29. In

-13-

addition, Mr. Skeens said his wife did not even know who she was or where she was for a number of days after she was transferred to St. Mary's. *Deposition of Mr. Skeens*, at 33. After about seven days, however, Mr. Skeens said his wife began to act like herself. *Id*. at 51-52. Thus, even if the Court would hold that the statute of limitations would have been tolled under § 55-2-15 for mental incompetency while she was at HealthSouth and St. Mary's, Mr. Skeens observations indicate she regained her competency by the time she was discharged from St. Mary's.

Plaintiffs claim that Ms. Skeens suffered from PTSD and repressed memories during the period that followed, but Plaintiffs have cited no cases and have made no arguments that these facts are sufficient to toll the statute of limitations based upon mental incompetency under § 55-2-15.[3] They do not argue that she did not have the mental capacity to bring suit. They only argue that the statute should be tolled under the discovery rule because she did not have enough information about her injury to bring a claim. However, as previously discussed, the Court finds Plaintiffs had sufficient knowledge to investigate and prosecute their claim at the time Ms. Skeens alerted her husband to the fact she was touched. Therefore, even if the Court were to assume that the statute of limitations should have been tolled until Ms. Skeens regained her lucidity while at St. Mary's, Plaintiffs still filed this action more than three years after Mr. Skeens made his observations.[4] Thus,

_____

[3]In fact, in note 2 of their Response brief, Plaintiffs assert that Ms. Skeens "has never been adjudged to be incompetent or otherwise unable to manage her own affairs." *Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment*, at 14 n.2.

[4]According to Ms. Branhan, an Ohio physician told her that Ms. Skeens also had delusions in March of 2003. *Deposition of Ms. Branhan*, at 166. In *Worley*, the court held that:

In order for mental illness to toll the

(continued...)

as Plaintiffs did not file her claim within the two-year statute of limitations under West Virginia law,

the Court finds that Plaintiffs' claims are barred.[5]

## IV.
## CONCLUSION

Accordingly, for the foregoing reasons, the Court finds that Plaintiffs' claims cannot

proceed because the Complaint was filed outside of the statute of limitations and, therefore, the

Court **GRANTS** Defendants' Motion for Summary Judgment.

---

[4](...continued)
> commencement of the running of the statute of limitations pursuant to W. Va. Code § 55-2-15 (1923), the plaintiff must show that the interval between the tortious act and the resulting mental illness was so brief that the plaintiff, acting with diligence, could not reasonably have taken steps to enforce his or her legal rights during such interval.

Syl. Pt. 4, *Worley.* Given that Ms. Skeens' March of 2003 delusional episode was nearly seven months after the alleged events in this case, the holding in *Worley* would prevent this later delusion from tolling the statute of limitations.

[5]Although Defendants did not move for summary judgment on substantive grounds, upon review of the evidence presented, the Court is doubtful that Plaintiffs could have withstood such a motion. The only evidence Plaintiffs have of the alleged assault is Ms. Skeens' recollection, and her recollection reflects a time period in which Ms. Skeens' mental status clearly was compromised. Given the Court's review, the Court questions whether a reasonable juror could return a verdict in Plaintiffs' favor.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:        August 24, 2007

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE